**Jerry ZIMMERMANN, Plaintiff,**

v.

**IOWA DISTRICT COURT FOR BENTON COUNTY,**
**Defendant.**

**No. 91–527.**

Supreme Court of Iowa.

Jan. 22, 1992.

Amanda Potterfield of Johnston, Larson, Potterfield, Zimmermann & Nathanson, P.C., Cedar Rapids, for plaintiff.

Bonnie J. Campbell, Atty. Gen., John M. Parmeter, Sp. Asst. Atty. Gen., and Kathrine S. Miller–Todd, Asst. Atty. Gen., for defendant.

Considered by CARTER, P.J., and LAVORATO, NEUMAN, SNELL, and ANDREASEN, JJ.

LAVORATO, Justice.

The plaintiff, an attorney, challenges a contempt adjudication arising out of his alleged violation of a juvenile court order. We conclude the attorney's actions did not constitute contempt and therefore sustain the writ of certiorari.

I. *Factual Background.*

This attorney contempt case stems from juvenile court proceedings that followed a child in need of assistance (CINA) adjudication. The child in question, T.D., was determined to be a child in need of assistance because of alleged sexual abuse by her natural mother's live-in boyfriend. In a dispositional order following the CINA adjudication, T.D. was removed from her mother's care and custody and was placed

in the care and custody of T.D.'s maternal grandmother. Eventually the grandmother became both legal custodian and guardian of T.D.

Tanager Place is a counseling facility for troubled children. T.D. was enrolled in its sexual abuse treatment program. Tanager Place had been working with T.D., T.D.'s mother, and the mother's boyfriend pursuant to a case permanency plan. The mother—J.D.—was resistant to the treatment program. She and her boyfriend continued to assert that the alleged sexual abuse had not occurred.

Attorney Jerry Zimmermann represented J.D. throughout the CINA proceedings relevant here. On J.D.'s behalf, Zimmermann filed an application to modify custody of T.D. (application) on March 23, 1990. Through the application, J.D. sought to have T.D. returned to her care and custody.

The application alleged several things. First, whether the sexual abuse had ever occurred was doubtful because of T.D.'s alleged recantation. Second, the Iowa department of human services had made no attempt to reunite the family—T.D., J.D., and the boyfriend—in any meaningful way. (All three had been living in the same home before T.D.'s allegation of sexual abuse.) Third, the department continued to demand that before family reunification could be achieved, the boyfriend had to go to sexual abuse counseling. Last, before the boyfriend could seek such counseling he had to admit he was guilty of the sexual abuse, something he refused to do because he believed he was not guilty.

The application informed the court that both J.D. and her boyfriend had been interviewed and examined by J. Douglas Brewer, a clinical psychologist. These encounters were part of an effort to assess any potential risk to T.D.'s safety if she were returned to J.D.'s home.

In the application Zimmermann also stated: "In order to provide the court with the maximum benefit of his input, it would be beneficial for [T.D.] also to be examined by psychologist Douglas Brewer."

Zimmermann closed the application by requesting the juvenile court to (1) order the examination of T.D. by Brewer, and (2) set the application for hearing.

On April 17, 1990, juvenile court referee Patrick R. Grady—without a hearing—ruled as follows:

Hearing on the mother's application to modify prior dispositional orders shall be set for May 22, 1990, at 9:30 a.m. *At this time the court denies the request of counsel for the mother that the child be evaluated by Dr. Douglas Brewer.* Hearing on this matter shall be set for the rest of the morning.

(Emphasis added.) The hearing was rescheduled for June 5, 1990.

On May 2 the department submitted its case progress report to the juvenile court. Tanager Place's April 27 quarterly report was attached to it. The quarterly report noted the filing of the application and stated that:

[w]ith regards to the modification of custody issue mentioned earlier, [T.D.] has made it very clear that she does not wish to meet with Dr. Brewer for an evaluation.

The department's progress report was sent to counsel of record on May 7.

Because J.D. and her boyfriend were not cooperating, Tanager Place recommended that custody remain with T.D.'s grandmother. Specifically, the recommendation was based in part on J.D.'s reluctance to provide support for T.D. The recommendation was also based in part on the boyfriend's refusal to become involved with therapy. T.D.'s counselor would not recommend T.D.'s return to her mother because the counselor felt that the boyfriend remained a danger to T.D. as long as he continued to deny the sexual abuse.

Because of this stalemate, the boyfriend sought an evaluation from Brewer, the clinical psychologist. Brewer then met with J.D. Brewer wrote Zimmermann about his evaluation of both adults and offered to evaluate T.D.

On May 17 Zimmermann answered Brewer's letter, telling him of the upcoming court hearing on the application. In addition, Zimmermann wrote as follows:

I appreciate that you have agreed to come to the hearing and per your request, *I have asked [J.D.] to schedule an appointment for [T.D.] at your office prior to the court date.*

(Emphasis added.)

Zimmermann called T.D.'s grandmother and asked for her permission to have T.D. examined by Brewer. The grandmother gave her permission.

Apparently, J.D. made the appointment for Brewer to see T.D. Brewer saw and evaluated T.D. on two separate occasions before the hearing on the application: May 21 and May 30. J.D. took T.D. to Brewer on both occasions and paid his fee.

Zimmermann neglected to tell the juvenile court, the department, the attorney for the child who was also the child's guardian ad litem, and the attorney for the grandmother about Brewer's evaluation of T.D. These parties first learned of the evaluation during the hearing on the application to modify custody.

In preparing for the modification hearing, Zimmermann asked J.D. to bring T.D. to his office for a visit. J.D. did so without the knowledge of the court or the attorney for the child. Zimmermann visited with the child for a short period of time. Meanwhile, J.D.'s boyfriend showed up at Zimmermann's office apparently unannounced. Zimmermann had a short conversation with J.D., T.D., and the boyfriend before talking alone with T.D. (Several early case permanency plans adopted by the juvenile court allowed J.D. visitation with T.D. but specifically excluded the boyfriend from the visitation.)

The rescheduled hearing on the application was held on June 5 and July 2. Juvenile court referee Patrick R. Grady heard the matter. During the course of the hearing Brewer's evaluation of T.D. was revealed to the court.

The court denied modification but did modify visitation in favor of J.D. and the boyfriend. At the end of the order, the court stated in part:

The court is greatly disturbed by the activities of counsel for the mother in this litigation. The evidence is undisputed that attorney Zimmermann had possibly two meetings where [T.D.] was present and he spoke with her without having gained the prior consent of her guardian ad litem. Not only did this result in a violation of the no contact order issued by this court between [the boyfriend] and the child, it also could be seen as communication with an adverse party. *See* D.R. 7–104(A)(1) and E.C. 7–18 of the Iowa Rules of Professional Responsibility....

The court finds more clear and certainly more disturbing the apparently uncontroverted evidence that shows that attorney Zimmermann either actively violated a direct order from this court and/or advised his client to violate directly an order of this court. Counsel for the mother had requested that the child be seen by Dr. Brewer prior to the modification hearing. This court entered an order on April 17, 1990, denying the request that the child be evaluated by Dr. Brewer. Despite this order, apparently counsel for the mother arranged for and had the child seen by Dr. Brewer on May 21 and 30. Counsel did this without disclosing to Dr. Brewer that there was a court order prohibiting him from seeing the child and clearly did this without seeking the further permission of the court or the child's guardian ad litem.

The court concludes by ordering Zimmermann to show cause why he should not be held in contempt for violating the court order of April 17.

II. *Procedural Background.*

Shortly after the juvenile court's ruling, the State filed an application for a rule to show cause why Zimmermann should not be held in contempt of court. *See* Iowa Code § 665.7 (1989). Following a hearing on the matter, district associate judge Michael J. Newmeister found Zimmermann in contempt for willfully and illegally resisting the April 17 court order by having Brewer evaluate T.D. *See* Iowa Code § 665.2(3).

The court offered Zimmermann alternative punishments for his contempt viola-

tion: (1) serving forty-eight hours in jail, or (2) performing forty-eight hours of unpaid community service.

Zimmermann then filed a notice of direct appeal with this court. Iowa Code section 665.11 mandates that "[n]o appeal lies from an order to punish for a contempt, but the proceedings may, in proper cases, be taken to a higher court for revision by certiorari." So we treated this appeal as if originally cast as a certiorari proceeding and granted the writ of certiorari. *See* Iowa R.App.P. 304.

### III. *Scope of Review and Burden of Proof.*

A. *Scope of review.* Certiorari is an action at law. Certiorari tests the legality of an action taken by a lower court or tribunal—here, the district court adjudication of contempt. *Callenius v. Blair,* 309 N.W.2d 415, 419 (Iowa 1981). So our review is at law and not de novo. *Lane v. Oxberger,* 224 N.W.2d 245, 247 (Iowa 1974). The factual findings of the district court are binding upon us if supported by substantial evidence. Iowa R.App.P. 14(f)(1). The court's legal conclusions, however, are not. *See In re Mt. Pleasant Bank & Trust Co.,* 426 N.W.2d 126, 129 (Iowa 1988).

B. *Burden of proof.* Further, we have said that all contempts are quasi-criminal, even when they arise from civil cases. *Phillips v. Iowa Dist. Court,* 380 N.W.2d 706, 708–09 (Iowa 1986). This quasi-criminal characteristic mandates that proof of contempt be established beyond a reasonable doubt. *Id.* at 709.

### IV. *The Validity of the Contempt Adjudication.*

Zimmermann generally asserts that he was not in contempt because there was no record evidence beyond a reasonable doubt that he illegally resisted a court order in violation of Iowa Code section 665.2(3). He specifically contends the district court erred in finding that the April 17, 1990, juvenile court order was clear, definite, and unambiguous. For reasons that follow we agree.

Iowa Code section 665.2 defines contempt, which can fall within any one of six categories. It states in pertinent part:

The following acts or omissions are contempts, and are punishable as such by any of the courts of this state, or by any judicial officer, including judicial magistrates, acting in the discharge of an official duty, as hereinafter provided:

. . . .

3. *Illegal resistance to any order or process made or issued by it.*

Iowa Code § 665.2(3) (emphasis added).

It is well settled that uncertainty, indefiniteness, or ambiguity of a court order is a defense to a contempt adjudication. *Palmer College of Chiropractic v. Iowa Dist. Court,* 412 N.W.2d 617, 620 (Iowa 1987). Whether language in an order is subject to such infirmities involves our interpretation of the language. And our interpretation is a law and not a fact question. *In re Mt. Pleasant Bank,* 426 N.W.2d at 133.

The critical language in the April 17 order is this: "At this time the court denies the request of counsel for the mother that the child be evaluated by Dr. Douglas Brewer." We agree with Zimmermann that this language is susceptible of two reasonable interpretations: the contempt court's interpretation and Zimmermann's.

The contempt court interpreted the language as absolutely forbidding an evaluation of T.D. In contrast, Zimmermann interprets the language as simply *denying his request to order* the evaluation.

The problem with the contempt court's interpretation is this: it requires the reader to infer from the juvenile court's denial that evaluation of T.D. is prohibited without prior court approval. Where liberty interests are at stake, we simply cannot "supply by interpretation constraints that are not expressed" in the court order. *Hudson v. Jenkins,* 288 N.W.2d 566, 572 (Iowa 1980) (in contempt proceeding involving lawyer this court rejected argument that an order delaying appeal was implicit in an order delaying action on application for appointment of counsel to prosecute appeal; lawyer was not in contempt for

prosecuting appeal notwithstanding the order delaying action on the application for appointment of counsel). Because there was no *express* order prohibiting the evaluation, Zimmermann did not illegally resist any order when he had Brewer evaluate T.D.

Our careful search of the record reveals no previous prohibition against evaluation of T.D. So T.D.'s legal custodian and guardian could have permitted an evaluation *without* a court order. In these circumstances, it was even more imperative that any such prohibition be clearly spelled out in the juvenile court order had that been the court's intention.

## V. *Ethical Implications.*

 The result we reach does not preclude disciplinary proceedings concerning Zimmermann's actions in this case. *See Committee on Professional Ethics & Conduct v. Lapointe,* 415 N.W.2d 617, 619 (Iowa 1987). Zimmermann knew the order was—in his own words—"potentially ambiguous." In these circumstances the safe and perhaps ethical approach would have been to seek a clarification of the juvenile court's order. *Cf. Committee on Professional Ethics & Conduct v. McCullough,* 465 N.W.2d 878, 885–86 (Iowa 1991).

In addition, Zimmermann concedes he did not confer with the child's attorney nor with the legal guardian's attorney before Brewer's evaluation. The child had previously stated she did not want to be evaluated by Brewer. And the guardian testified she had forgotten about the April 17 order when she talked to Zimmermann. The child and the guardian were thus stripped of any benefit of counsel on this important issue. *See* DR 7–104(A)(1) (lawyer shall not communicate on subject of representation with a party represented by counsel without counsel's consent); EC 7–18 (same).

We leave these ethical questions to those responsible for prosecuting ethical violations.

## VI. *Disposition.*

Because the April 17 order does not in clear, unambiguous, and definite language prohibit an evaluation of T.D., Zimmermann did not illegally resist the order. So he was not in contempt of that order. The writ of certiorari must therefore be sustained. But our decision does not preclude disciplinary proceedings against Zimmermann because of his actions.

WRIT SUSTAINED.